# United States Court of Appeals
## for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

*March 27, 2023*

Nathan Ochsner, Clerk of Court

No. 21-20174

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2023

Lyle W. Cayce
Clerk

FORT BEND COUNTY; FORT BEND COUNTY DRAINAGE DISTRICT; CINCO MUNICIPAL UTILITY DISTRICT NO. 1,

*Plaintiffs—Appellants,*

*versus*

UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL TODD T. SEMONITE; COLONEL LARS ZETTERSTROM; RICHARD LONG,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-1739

---

Before DENNIS, SOUTHWICK, and WILSON, *Circuit Judges.*

LESLIE H. SOUTHWICK, *Circuit Judge*:

This case arises from major flooding events in the Houston area in 2016 and 2017. Local political subdivisions sued the United States Army Corps of Engineers, seeking compliance with alleged regulatory obligations. The district court dismissed with prejudice for lack of subject matter jurisdiction and for failure to state a claim. We REVERSE and REMAND for further proceedings.

No. 21-20174

## FACTUAL AND PROCEDURAL BACKGROUND

The Flood Control Act of 1936 authorized the United States Army Corps of Engineers (the "Corps") and other federal agencies, in cooperation with the states, to create and manage dams, levees, and other measures for the purpose of flood control. Flood Control Act of 1936, Pub. L. No. 74-738, 49 Stat. 1570, 1570 (1936).

The next year, the Corps' commanding general, who was a long-ago predecessor of defendant Todd Semonite, submitted a lengthy report to the Secretary of War about past flooding in what was referred to as the Buffalo Bayou Watershed; the Secretary of War then transmitted the report to the Speaker of the House. HOUSTON SHIP CHANNEL AND BUFFALO BAYOU, TEX., H.R. NO. 75-456 (1937) (Chief of Engineers' report, transmitted by Secretary of War to Speaker of the House), reprinted in 10180 U.S. CONG. SERIAL SET (1938). The report stated: "Extensive areas both in and above the city of Houston are inundated" by the waters. *Id.* at 2. The Corps' commander "recommend[ed] the improvement of Buffalo Bayou and its tributaries . . . to provide for the control of floods, the protection of the city of Houston from flood damages, and [for other purposes] by means of detention reservoirs" and other measures "which may be found advisable." *Id.* at 4–5.

In 1938, the Buffalo Bayou and Tributaries Project was among the many authorized by Congress to protect areas around the country from the impacts of flooding. River and Harbor Act of 1938, Pub. L. No. 75-685, 52 Stat. 802, 802, 804 (1938).

We quote a key document in the record that identifies later Congressional enactments:

> Addicks and Barker Dams were authorized by the 1939 Flood Control Act, a modification of the 1938 River and Harbor Act, . . . which authorized flood control work in the Buffalo Bayou watershed. The project was further modified by the Flood

2

No. 21-20174

> Control Act of 1954, House Document No. 250, 83rd Con-
> gress, 2nd Session, which authorized straightening, enlarging,
> and lining where necessary, on Buffalo, Brays, and White Oak
> Bayous.

U.S. DEP'T OF ARMY CORPS OF ENGINEERS, GALVESTON DISTRICT, WATER
CONTROL MANUAL, SAN JACINTO RIVER BASIN, at 3-1 (2012).

In sum, the project that had its beginnings in 1938 led to the construc-
tion of two dams and two associated reservoirs: the Addicks and the Barker
Reservoirs. The fundamental issue in the case is whether the Corps has vio-
lated any enforceable, legal obligation in the management of these dams and
reservoirs.

A potential source for obligations imposed on the Corps is the 2012
Water Control Manual ("WCM") adopted by the Corps for flood control in
the relevant watershed. The WCM describes its *raison d'être*:

> The purpose of this manual is to document the Addicks and
> Barker Reservoir regulation plans, to present detailed infor-
> mation to higher authority, and to give guidance to personnel
> concerned with or responsible for the regulation of Addicks
> and Barker Reservoirs during the life of the projects.

*Id.* at 1-1. Thus, the WCM applies to the Addicks and Barker Reservoirs that
are at issue in this appeal and not more generally to flood-control projects.
The Corps revises the WCM periodically.[1] The 2012 version discussed in
this case, with its tables, data on various subjects, photographs, and other

---

[1] The November 2012 WCM states that the "previous edition" was in April 1962.
*Id.* at i. We do not know if other editions preceded 1962, though no other editions are
mentioned. *Id.* at 1-1. One of the questions on this appeal is whether a 2019 version of the
WCM has mooted any part of the case that challenges provisions of the 2012 WCM. The
answer turns in part on whether the 2019 revision was sufficiently substantial to moot
claims under the 2012 version. It also matters if the Corps issued a revised WCM for the
purpose of mooting the case. More, later, on those possibilities.

No. 21-20174

information, is 157 pages in length. Other sources for potential duties imposed on the Corps will be discussed later.

Generally, the two reservoirs are empty. The gates that run along the dams remain open. During heavy rainfall, however, when flooding occurs or is expected downstream, the WCM instructs the Corps to close the gates and temporarily detain floodwater in the reservoirs. WATER CONTROL MANUAL at 7-4. If the water in the reservoirs reaches a set height, the Corps must monitor the inflow to the reservoirs from upstream areas. *Id.* at 7-4, 7-5. If the pool elevation and inflows are severe enough, the Corps releases the floodwater at a controlled rate into the Buffalo Bayou. *Id.*

The plaintiffs — Fort Bend County, Fort Bend County Drainage District, and Cinco Municipal Utility District No. 1 (the "County Parties" or "Plaintiffs") — are political subdivisions of Texas that own or control property upstream of the Barker Reservoir in Harris County. They allege the Corps designed and constructed the reservoirs to have a maximum design capacity ("MDP") to detain federally controlled floodwater that exceeds the boundary of land within the reservoirs that is owned by the United States or for which the government has a legal right of use. The parties refer, and thus so shall we, to such property as "government owned land" or "GOL." Moreover, according to the County Parties, the Corps' internal documents dating back to 1980 state the Corps is obligated to acquire additional land to comply with internal policies, but the Corps never requested authorization from Congress to purchase the additional land that would have brought GOL up to the MDP. Further, the Corps allegedly adopted the WCM with procedures and standing instructions that failed to address the problem of flooding on the non-GOL upstream from the reservoirs, which they allegedly knew would occur "in the event of a maximum design weather event." In fact, the

4

No. 21-20174

procedures adopted in the WCM enable the Corps to impound floodwater on non-GOL.

Flooding disastrously occurred during the "Tax Day Flood" that began on April 15, 2016. It reoccurred after Hurricane Harvey in 2017 when the Corps impounded floodwater on non-GOL upstream from the reservoirs. The floods caused the County Parties' "property, facilities, and equipment and that of their residents [to become] involuntary repositories for unsanitary Reservoir water for an extended period" at costs the County Parties allege were in the millions of dollars. The floods also forced residents to relocate outside of the county, which allegedly caused a significant reduction in the County Parties' tax revenues.

In May 2018, the County Parties filed suit against the Corps in the United States District Court for the Southern District of Texas. They asserted there was jurisdiction for the suit under 28 U.S.C. §§ 1331, 1361, and sought review of agency action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706. They challenged the Corps' adoption of the WCM without including procedures to prevent the flooding of their property, the Corps' failure to revise the WCM after the 2016 and 2017 floods, and the Corps' failure to acquire their lands when the Corps adopted the WCM and after the floods. The County Parties sought injunctive and declaratory relief that would prevent the Corps from detaining floodwater on non-GOL and implementing the portions of the WCM that require the Corps to retain water on those lands.

After filing this suit, the County Parties filed a Freedom of Information Act ("FOIA") request to obtain the administrative record of each of the three matters on which they sued, *i.e.*, adoption of the WCM and the two failures to act. *See* 5 U.S.C. § 552. While the FOIA request was pending, the County Parties filed a motion for jurisdictional discovery to obtain the Corps'

No. 21-20174

regulations, internal documents interpreting those regulations, and depositions of Corps officials. The Corps opposed the motion, arguing discovery was unnecessary to determine the pure question of law of whether the Corps had a duty to act under the Corps' internal regulations. Some of those regulations, though, were unpublished and otherwise unavailable. The County Parties responded that they were seeking discovery of the regulations and other relevant evidence necessary to show the Corps had a legal duty to act. Meanwhile, the Corps responded to the County Parties' FOIA request, stating the administrative record had not yet been identified for the agency actions and the request for the regulations would be answered later. It appears, though, that the Corps never provided documents in response to the FOIA requests for the administrative record for the three agency actions at issue in this case.

The same day the County Parties filed their motion for jurisdictional discovery, the Corps moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Corps argued the court lacked subject matter jurisdiction because the complaint was seeking relief for a taking by the federal government, a claim which had to be brought in the Court of Federal Claims ("Claims Court"). The Corps argued, in the alternative, the complaint should be dismissed for failure to state a claim, because the complaint failed to identify any discrete, mandatory duty that the Corps failed to perform, which is required to compel agency action under Section 706(1).

The district court denied the County Parties' motion for discovery as moot because the FOIA request had been "answered." Two days later, the district court ordered the Corps to "furnish a one-page statement that describes — in clear, practical terms — what it did, why it did it, and the consequences of alternative responses." The Corps responded. Almost a year later, the district court dismissed the case with prejudice. It held the dispute was one for the Claims Court. The County Parties timely appealed.

6

No. 21-20174

## DISCUSSION

The County Parties have identified three issues on appeal: (1) whether the district erred in concluding it lacked subject matter jurisdiction over their APA claims; (2) whether the district court erred in dismissing the case for failure to state a claim; and (3) whether the case should be reassigned to another judge if remanded. We will address each issue separately.

"We review a district court's grant of a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) *de novo.*" *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014). When reviewing a district court's grant of a Rule 12(b)(1) and a Rule 12(b)(6) motion to dismiss, we start with the jurisdictional challenge before addressing the challenge on the merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### I.   Subject matter jurisdiction

The district court dismissed the action under Rule 12(b)(1), concluding the Claims Court has exclusive jurisdiction over the County Parties' claims. The County Parties disagree, asserting the United States has waived sovereign immunity in this case under 5 U.S.C. § 702. They also argue the Corps' actions are reviewable under 5 U.S.C. § 704.

In reviewing a Rule 12(b)(1) motion to dismiss where the district court relied only on the face of the complaint, as here, "our review is limited to determining whether the district court's application of the law is correct." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 639 (5th Cir. 2021) (quotation marks and citations omitted). A Rule 12(b)(1) motion to dismiss "should be granted only if it appears certain the plaintiff[s] cannot prove any set of facts that would entitle [them] to recovery." *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017). The parties asserting federal

No. 21-20174

subject matter jurisdiction bear the burden of proving a court has such jurisdiction. *See Alabama-Coushatta Tribe of Tex.*, 757 F.3d at 487.

The County Parties rely on two APA sections. We examine both.

a.   Section 702

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Waivers of sovereign immunity must be strictly construed in favor of the sovereign. *Alabama-Coushatta Tribe of Tex.*, 757 F.3d at 488. The terms of those waivers, set forth by Congress, define the parameters of federal courts' subject matter jurisdiction over actions against the Government. *Wilkerson v. United States*, 67 F.3d 112, 118 (5th Cir. 1995).

The County Parties contend the United States has waived its sovereign immunity under this section of the APA:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages . . . shall not be dismissed . . . on the ground that it is against the United States.

5 U.S.C. § 702. This section "waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *Alabama-Coushatta Tribe of Tex.*, 757 F.3d at 488 (quotation marks and citations omitted).

A party has standing to sue under Section 702 when two requirements are met. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990). First, plaintiffs "must identify some 'agency action,'" which is the basis for judicial review. *Id.* at 882. The APA defines "agency action" to include "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

8

No. 21-20174

failure to act." 5 U.S.C. § 551(13).   When the judicial review sought is "under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan*, 497 U.S. at 882 (quoting 5 U.S.C. § 704).   Second, plaintiffs must show they have "'suffer[ed] legal wrong' because of the challenged agency action" or that they have been "'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'" *Id.* at 883 (quoting 5 U.S.C. § 702).

The Third Amended Complaint, which is the operative one, identifies three agency actions: (1) the Corps' adoption of the WCM without including procedures to prevent the flooding of the County's property; (2) the Corps' failure to revise the WCM following the 2016 and 2017 floods; and (3) the Corps' failure to acquire the Plaintiffs' lands when the WCM was adopted and after the floods.   The Corps conceded before the district court that the adoption of the WCM is final agency action.[2]   The other actions are "failures to act" under the APA.   In addition, the complaint identifies economic harms that are said to be fairly traceable to the procedures in the WCM and the Corps' failure to acquire additional lands.

The district court concluded the requested relief was equivalent to "money damages."   *See* 5 U.S.C. § 702.   Whether that is correct depends on the application of the following standard:

> Our cases have long recognized the distinction between an action at law for damages — which are intended to provide a victim with monetary compensation for an injury to his person,

---

[2] The Corps argued the following in its briefing in district court: "Because Fort Bend's real alleged injuries sound in tort or takings theories, it is not clear . . . whether Fort Bend's injuries would be redressable even if its APA challenge to the [WCM] [was] successful. Accordingly, the Corps reserves the right to challenge Fort Bend's standing if any claims are allowed to proceed beyond the motion to dismiss stage." The Corps has not discussed standing in its briefing on appeal.

No. 21-20174

property, or reputation — and an equitable action for specific relief — which may include ... "the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions."

*Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949)) (emphasis omitted). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.*

The operative complaint requests three types of relief: (1) an injunction preventing the Corps from unconstitutionally impounding floodwater on non-GOL and/or from applying the portions of the WCM that enable the Corps to do so; (2) a declaratory judgment that the Corps' identified actions are unlawful and should be set aside under 5 U.S.C. § 706(2); and (3) "[s]uch other and further relief, legal or equitable, to which [the County Parties] may show themselves to be justly entitled." Other relief includes compelling the Corps to update its WCM and acquire additional land under 5 U.S.C. § 706(1), as the Plaintiffs pled elsewhere in their complaint.

The Corps urges us to apply a prohibition on review for when there is "any other statute that grants consent to suit [that] expressly or impliedly forbids the relief which is sought." *See* 5 U.S.C. § 702. According to the Corps, relief is prohibited by sections of the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491(a). That Act grants concurrent jurisdiction in the Claims Court and federal district courts over any claims for damages against the United States, not exceeding $10,000, founded upon the Constitution, federal statute, or executive regulation, or upon any government contract. *Id.* § 1346(a)(2). The Claims Court has exclusive jurisdiction when the action seeks monetary relief exceeding $10,000. *Id.* § 1491(a)(1); *Sammons v. United States*, 860 F.3d 296, 299 (5th Cir. 2017).

No. 21-20174

The district court concluded the Tucker Act applied and the Claims Court has exclusive jurisdiction over the action because the case "in its soul" arises under the Takings Clause. A takings "claim is 'founded upon the Constitution' and within the jurisdiction of the Court of [Federal] Claims to hear and determine." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) (quoting *United States v. Causby*, 328 U.S. 256, 267 (1946)). The potential damages alleged by the complaint clearly exceed $10,000, which would place exclusive jurisdiction with the Claims Court.

The County Parties argue the complaint does not allege a takings *per se* and instead seeks to compel the Corps to comply with its internal regulations. The complaint alleges they are entitled to injunctive, declaratory, and mandamus relief under Section 706(1) and 706(2) of the APA, relying upon the Corps' internal regulations. Nonetheless, the complaint reveals that the County Parties attempt to support some of their APA claims under the Takings Clause. Specifically, when pleading that the complained of actions are "contrary to constitutional right" under 5 U.S.C. § 706(2)(B), the complaint relies upon the Due Process[3] and Takings Clauses of the Fifth Amendment. The Supreme Court has prohibited federal courts from setting aside agency action as violating the Takings Clause under Section 706(2)(B). *Knick*, 139 S. Ct. at 2179. Such claims are unavailable when the property owner may obtain compensation in the Claims Court. *Id.*

---

[3] In their opposition to the Corps' motion to dismiss, the County Parties argued their APA claims were supported by the Due Process Clause. On appeal, the County Parties have not renewed any arguments about Due Process. They therefore have forfeited any argument that the district court erred by concluding it lacked subject matter jurisdiction over claims arising under the Due Process Clause. *See Williams v. Henagan*, 595 F.3d 610, 615 (5th Cir. 2010).

No. 21-20174

Consequently, the County Parties may not rely on the Takings Clause to plead their APA claims.[4]  The only relief that explicitly involves the expenditure of money is the demand that the Corps be ordered to acquire additional land.  Even though this would require the Corps to pay money to the Plaintiffs, that fact alone is not a sufficient reason to characterize the relief as money damages.  *See Bowen*, 487 U.S. at 893.  Indeed, the complaint alleges the Corps is required to acquire additional land to comply with its internal regulations.  We have held that "where the statute in question specifically mandates the payment of money," the suit may go forward under Section 702.  *Anderson v. Jackson*, 556 F.3d 351, 359 (5th Cir. 2009).  That is because such relief is prospective and cannot be characterized as "compensatory relief . . . designed to substitute for an injury to the plaintiff's person, property, or reputation."  *Id.*  So too, here, the County Parties allege the agency's internal regulations mandate specific action, and an order by a court would direct the agency to comply.  We conclude the County Parties have avoided pleading a Tucker Act claim.

We now address the Corps' several arguments that there was no subject matter jurisdiction over the case.

First, the Corps argues the Supreme Court precludes equitable relief where a party may obtain compensatory relief for a takings claim.  The precedents cited involve claims premised only on the Takings Clause, not claims alleging violations of a statute or an agency regulation *per se*.  *See, e.g., Hurley v. Kincaid*, 285 U.S. 95, 99, 104–05 (1932); *Dugan v. Rank*, 372 U.S.

---

[4] Despite concluding it lacked subject matter jurisdiction over the entire case, the district court dismissed the case with prejudice.  When a district court dismisses a case for lack of subject matter jurisdiction, the proper course is to dismiss the case without prejudice.  *Mitchell v. Bailey*, 982 F.3d 937, 944 (5th Cir. 2020).

No. 21-20174

609, 625–26 (1963).[5]  The Corps does not cite any Supreme Court or court of appeals case where a Section 706 claim had to be filed in the Claims Court because there was *also* a potential takings claim.  The principal claims here do not rely on the Takings Clause.  Though it appears one claim does, that does not block jurisdiction over the remainder.

Second, the Corps argues the County Parties cannot circumvent the limitation on equitable relief, because none of the internal regulations the Plaintiffs attempt to rely upon imposes a discrete, mandatory duty.  The requirement that the County Parties identify a discrete, mandatory duty to compel agency action under 5 U.S.C. § 706(1) relates to whether the County Parties have asserted a federal cause of action.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) ("*SUWA*"); *see also Mendoza-Tarango v. Flores*, 982 F.3d 395, 399 (5th Cir. 2020).  Where a defendant challenges the court's jurisdiction by attacking the underlying federal cause of action, "the proper course of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case under either Rule 12(b)(6) or Rule 56."  *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)).  Thus, the argument is not relevant as we consider jurisdiction, but we will address it when discussing the Corps' Rule 12(b)(6) motion to dismiss.

---

[5] The other cases cited by the Corps involving other federal statutes likewise involved claims premised on violations of the Fifth Amendment's Takings Clause, and those claims did not involve an alleged violation of a statute or an agency's regulations *per se*. *See Preseault v. ICC*, 494 U.S. 1, 11–17 (1990); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–29, 129 n.6 (1985); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 999–1004, 1016–19 (1984); *Dames & Moore v. Regan*, 453 U.S. 654, 688–89 (1981); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294–97, 297 n.40 (1981); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 94 n.39 (1978); *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 124–28 (1974).

No. 21-20174

Third, the Corps also argues we should "'pierce' the pleadings" to prevent the County Parties from undercutting the jurisdiction of the Claims Court. We have in some instances "pierced" the pleadings to determine whether the substance of a claim seeking equitable relief is equivalent to a claim seeking monetary relief. *See Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 361 (5th Cir. 1987). We see no basis in this suit to use such caselaw to reconstruct the legal claim alleged in the complaint.

Section 702 of the APA has been satisfied in that the complaint alleges plaintiffs have been aggrieved by agency action, that the suit is not one for money damages, and that the injury arises from an officer or employee who has acted or failed to act in an official capacity or under color of law.

> b.      *Section 704 — Adequacy of the remedy*

Jurisdiction also requires the complaint meet the requirements of 5 U.S.C. § 704. *See Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018). Section 704 provides for judicial review only of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." The Corps argues the Tucker Act provides such an adequate remedy. We thus focus on this issue.

For a remedy to be "adequate," it "must provide the petitioner specific procedures by which the agency action can receive judicial review or some equivalent." *Hinojosa*, 896 F.3d at 310 (quotation marks and citation omitted). Although the remedy "need not provide an identical review that the APA would provide, it must offer the same genre of relief." *Rollerson*, 6 F.4th at 642 (quotation marks and citations omitted). "Ultimately, the exception will apply only if there is clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review." *Id.* (quotation marks and citations omitted). "This requirement entails a case-specific evaluation." *Hinojosa*, 896 F.3d at 310.

No. 21-20174

The Corps argues the Tucker Act provides an adequate remedy because it allows the County Parties to seek compensation for any potential taking. Our earlier analysis reveals that argument has not convinced us. Although the takings claim may compensate the County Parties for past harms that have resulted from flooding events, it would not affect future flooding and further degradation to their community. "The Claims Court does not have the general equitable powers of a district court to grant prospective relief." *Bowen*, 487 U.S. at 905. Only a district court can grant such relief. The Corps concedes such equitable relief would be precluded in the Claims Court.

The Corps notes that "hundreds of landowners located near Addicks and Barker Dams whose properties flooded during Hurricane Harvey have litigated takings claims against the United States in the [Claims Court] for several years." Those cases, however, were brought by private landowners who sought compensation for takings. *See In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 227–28 (2019); *In re Downstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 147 Fed. Cl. 566, 569 (2020). Those cases do not involve the "complex ongoing relationship" that may exist in a dispute between two governments, where the Supreme Court said it would not "assume, categorically, that a naked money judgment . . . will always be an adequate substitute for prospective relief." *See Bowen*, 487 U.S. at 905.

We hold the Tucker Act does not provide an "adequate remedy" to the County's claims within the meaning of Section 704.[6]

---

[6] The Corps also argues, for the first time on appeal, that the County Parties' challenge to the adoption of the WCM is moot due to the issuance of a new WCM in October 2019. *See Colorado Off Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1135 (10th Cir. 2004) (holding challenges to a national forest plan became moot upon the

No. 21-20174

## II.    *Dismiss for failure to state a claim*

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court does not accept as true legal conclusions or conclusory statements. *Id.* A claim is facially plausible if the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court may consider sources outside of the complaint, such as documents incorporated into the complaint by reference and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

The district court dismissed the County Parties' claims under Rule 12(b)(6). The County Parties argue they have successfully stated claims under Sections 706(2)(A) and 706(1) of the APA. We separately consider the County Parties' claims under each section.

---

issuance of a new plan). The County Parties respond that the Corps' hyperlinked document and the WCM's enabling regulation demonstrate the WCM has not been superseded, only updated, and that such routine updates are "capable of repetition, yet evading review." *See, e.g., Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 246 (5th Cir. 2006).

Even though we will consider mootness arguments raised for the first time on appeal, *see Goldin v. Bartholow*, 166 F.3d 710, 718 (5th Cir. 1999), we decline to address this argument now. Both copies of the WCM are not in the record; the link provided by the Corps does not lead to the revised WCM; the issue has been minimally briefed. The Corps may renew this argument before the district court.

16

No. 21-20174

### a.    Section 706(2)(A)

The complaint alleges the adoption of the WCM was arbitrary and capricious.[7]  Under the APA, we will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). We also are to invalidate agency action that is "in excess of statutory . . . authority." *Id.* § 706(2)(C).  "Agency action is arbitrary and capricious if the agency relied on factors that Congress did not intend it to consider, failed to consider an important aspect of the problem, or offered an explanation counter to the evidence." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). Such review is neither sweeping nor intrusive. Instead, we "ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision; we cannot substitute our judgment for the agency's." *Id.*

The district court determined that if the Tucker Act did not apply, the claims still failed because there was no "mandatory, non-discretionary duty that the Corps did not follow." Such a duty is necessary to show error when an agency has failed to act. *SUWA*, 542 U.S. at 64 (interpreting Section 706(1)). The district court did not separately analyze the Plaintiffs' one claim that is based on completed agency action, namely, the adoption of the WCM in 2012. We start there, then examine the claims based on a failure to act.

In the district court, the Corps, in its motion to dismiss, made a relevant concession about the WCM:

---

[7] The complaint also challenges the Corps' failure to amend the WCM after later flooding events and to acquire additional land when the WCM was adopted under Section 706(2)(A).  "The APA provides relief for a failure to act in § 706(1)," not under Section 706(2). *See SUWA*, 542 U.S. at 62. Since the County Parties seek to compel the agency to act, we conclude these claims are not cognizable under Section 706(2). *See id.*

No. 21-20174

> Fort Bend has identified a third agency action it challenges: the adoption of the 2012 Water Control Manual for the Addicks and Barker reservoirs. Third Am. Compl. ¶ 19. To the extent Fort Bend's Third Amended Complaint is not dismissed in its entirety [because of the Tucker Act], it appears that Fort Bend's purported APA challenge to the Corps' adoption of the Water Control Manual could be sufficient to state a claim at the motion to dismiss stage.

The Corps went on to argue that claim would likely fail as a matter of redressability, but that is a matter for a later litigation stage.

On appeal, the Corps acknowledges this earlier statement and that the WCM claim is a challenge to "final agency action," but it then argues the 2012 WCM was superseded by an October 2019 Manual. Consequently, the Corps argues, the claim about the WCM is moot. The Plaintiffs respond that they first learned of a supposedly new WCM in the Corps' brief in this court, filed well after the alleged mooting of the claim by adoption of a new manual. The Plaintiffs' brief then seeks to convince that any changes are routine, administrative updates that do not alter the claim.

A claim against an agency regulation or other directive may become moot if the agency repeals the offending pronouncement.[8] *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). Nonetheless, if an agency repeals a challenged directive but then replaces it with a substantially similar one, there

---

[8] More generally, a defendant's voluntarily ceasing or withdrawing whatever is being challenged in a lawsuit while the suit is pending raises questions about the permanence of the change. A defendant must be able to show the conduct will not recur. *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009). Yet, when the defendant is a governmental actor, there is at least a presumption of good faith that allows us to "assume that formally announced changes to official governmental policy are not mere litigation posturing." *Id.* Without more being shown in this case than we have seen so far, the mootness issue here seems to turn on whether the 2019 manual made meaningful changes to the Corps' relevant obligations as set out in the 2012 WCM.

No. 21-20174

is no mootness because the injury remains. *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022). The key is whether the court can still order "effectual relief . . . to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation marks and citations omitted).

No significant effort has been made in the briefing here to identify relevant changes and their possible effect on the core allegations in this case. We see that frequent, potentially minor changes were anticipated in the 2012 version by its "Notice to Users of this Manual." The Notice stated the WCM would be maintained in "loose-leaf form," with individual pages occasionally revised. WATER CONTROL MANUAL at vi. The WCM seems the kind of document with occasional, partial revisions that do not affect the continuing validity of the remainder. On remand, the district court should evaluate the nature of the revisions in the 2019 WCM and, in light of the Plaintiffs' claims, how the mootness doctrine applies to those changes.

We now examine the Plaintiffs' claims about the 2012 WCM. We repeat that the Corps seemingly accepts there would be a proper Section 706(2) claim against the WCM (unless mootness applies) if the Tucker Act does not send this to the Court of Federal Claims. The Tucker Act does not do so, but we still need to analyze whether there is a plausible claim.

The district court insisted the Plaintiffs shorten their complaint. We do not consider the earlier, more robust assertions of claims, though those might have included relevant ones. We look at what was retained in the operative complaint about the WCM (as well as the failure to revise it):

> [T]he Corps failed to consider its duty to and the rights of upstream property owners when making its decision(s) to adopt the WCM and implement the "Standing Instructions" for operation of the Reservoirs. Additionally, the Corps failed to include in the WCM safeguards to prevent the flooding of

No. 21-20174

property outside the GOL. The Corps continues to use the outdated WCM, including its "Standing Instructions," and fails to revise it despite its knowledge of changed requirements resulting from developments in the Project area and changed environmental conditions within the Reservoirs. Thus, the Corps' WCM continues to subject Plaintiffs to imminent and irreparable harm.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 570). Plausibility turns on whether the claim as pled "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The allegation is the Corps acted arbitrarily and capriciously in adopting the WCM. For now, we ignore the failure to revise, *i.e.*, a failure to act, in reviewing this claim. The complaint cites the Engineer Regulation ("ER") that creates the duty[9] to prepare such manuals for flood-control projects:

> In addition, water control plans for projects owned and operated by USACE shall be developed in concert with all basin interests which may be impacted by or influence project regulation, and public involvement in the development or significant revision of water control plans shall be provided for as required under this regulation. These considerations should be addressed by a water control manual and reflected in an approved water control plan.

---

[9] The 2012 WCM states its creation was authorized by ER 1110-2-240, dated October 8, 1982. WATER CONTROL MANUAL at 1-1. There is a 2016 revised regulation, codified at 33 C.F.R. § 222.5.

No. 21-20174

ER 1110-2-240 § 1-5(a) (page 1-2). The complaint identifies 12 different provisions of ER 1110-2-240 that allegedly were improperly applied when creating the WCM. Included is the claim that the Corps was arbitrary in its consideration of the interests of owners of property upstream, including allowing impounding of more water than could be contained on government land.

We do not see in this regulation, nor has any party suggested, that creation of a WCM is to be conducted through formal notice and comment procedures. All we can determine from the regulation about the process for creating a WCM is that the Corps delegated authority for final approval to the Corps' Division commander or that person's designee. ER 1110-2-240 § 3-1(g) (page 3-2).

The Plaintiffs are seeking review, under the APA, of the Corps' final agency action in promulgating the WCM. Importantly, review under Section 706(2)'s arbitrary and capricious standard "is limited to the record before the agency at the time of its decision." *Luminant Generation Co., L.L.C. v. U.S. E.P.A.*, 675 F.3d 917, 925 (5th Cir. 2012) (quotation marks and citations omitted). The Corps has been reluctant to provide such a record. The district court allowed the Corps to avoid doing so. It is true that if a case can be dismissed on jurisdictional or other preliminary grounds, there is no need for the record. We have concluded, though, the Tucker Act is no bar to the claim about the WCM. We have left open the issue of mootness, which will need to be decided by the district court. Yet, if the case is not moot, then the record of how the Corps did or did not evaluate the considerations required by ER 1110-2-240 must be provided. It is unclear to us what record would exist for preparing the WCM, but that is for the Corps to explain. The explanation should be presented in a manner that allows the court to evaluate its accuracy, and the record itself needs to be provided.

21

We reverse the district court's dismissal of this claim and remand.  If the claim about the WCM is held not to be moot, the district court must review the merits of the County Parties' claims based on the agency record.

> ## b.    Section 706(1)

The complaint also contests, under Section § 706(1), the Corps' failure to amend the WCM after the recent flooding events or to acquire additional land when the WCM was adopted and after the flooding events.

When an agency fails to act, federal courts may "compel agency action unlawfully withheld or unreasonably delayed."  § 706(1).  A court's authority to compel agency action is limited to instances where an agency ignored "a specific, unequivocal command" in a federal statute or binding regulation.  *See SUWA*, 542 U.S. at 63 (quotation marks and citation omitted).

The first requirement under Section 706(1) is that a plaintiff must challenge *discrete* agency action.  *Id.* at 64; *Mendoza-Tarango*, 982 F.3d at 400.  Here, the County Parties have made a facially plausible showing that the Corps failed to take discrete action.  We conclude the complaint challenges discrete agency action by challenging the Corps' failure to amend the WCM after recent flooding events and to acquire additional land when it adopted the WCM.  *See id.*

The second requirement under Section 706(1) is that the plaintiff identify discrete agency action the agency is *legally required* to take.  *SUWA*, 542 U.S. at 63.  "[T]he APA carried forward the traditional practice prior to passage, when judicial review was achieved through . . . writs of mandamus."  *Id.*  Writs of mandamus were normally limited to enforcing "a specific, unequivocal command" and "the ordering of a precise, definite act . . . about which [an official] had no discretion whatever."  *Id.* (quotation marks and citations omitted) (alterations in original).  Courts may only "compel an agency to perform a ministerial or non-discretionary act, or  to take action

upon a matter, without directing *how* it shall act." *Id.* at 64 (quotation marks and citation omitted).

We consider whether the complaint adequately pled the Corps was required to take action. The alleged compulsion comes from regulations and guidance documents promulgated by the Corps itself. The Corps concedes a regulation can mandate duties. The Supreme Court indicated as much when it stated that limiting challenges to agency actions that are mandatory "rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 65. The Corps' brief argues, though, that certain documents relied on in the complaint cannot create a mandatory duty: "unlike regulations, statutes, or even internally binding rules in a water control manual, the cited 'guidance' in the technical letter cannot form the basis for a 'mandatory' duty claim under the APA."

We will examine the text of the cited Corps regulations for mandatory language. Any regulations that contain such language will be deemed sufficient at the pleading stage. We leave open at this point whether any authority cited by the Plaintiffs that is not a regulation can create a duty to act.

"We interpret regulations in the same manner as statutes, looking first to the regulation's plain language." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 573 (5th Cir. 2017) (quotation marks and citation omitted). When regulatory language is unambiguous, we apply the plain meaning of the language. *Id.* Though the plain meaning of regulatory language is generally controlling, we must read a regulation's language in the "'specific context in which that language is used.'" *Mayorkas*, 24 F.4th at 390 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

No. 21-20174

### *i.    Failure to revise the WCM*

The County Parties contend the Corps was legally required to update the WCM after the recent flooding events, citing ER 1110-2-240 §§ 3-2(j)(1), 3-1(e).[10]  Of course, the Corps now informs us it has revised the WCM.  The County Parties, though, have not alleged it was time for a revision just in the abstract; they have asserted the WCM needed to be revised to respond to the flooding.  The Corps does not claim it adjusted the WCM in a manner that responds to the flooding events.  Thus, the issue of the need for specific revisions is not automatically mooted by the fact there has been some revision.

We examine what is in the WCM about required revisions.  Section 3-2(j)(1) applies to revising water control plans, and Section 3-1(e) to WCMs.  The County Parties have not alleged the Corps failed to update any water control plan, so Section 3-2(j)(1) is inapplicable.  *See* § 3-2(j)(1).  That leaves Section 3-1(e), which describes when WCMs should be revised:

> Water control manuals . . . shall be revised as necessary to conform to changing requirements resulting from developments in the project area and downstream, improvements in technology, improved understanding of ecological response and sustainability, new legislation, and other relevant factors, provided such revisions comply with existing federal regulations and established Corps policy.

*Id.* § 3-1(e).

---

[10] The parties have used the citations we are using to the regulations.  We noted earlier that the key regulation, ER 1110-240, appears to be found at 33 C.F.R. § 222.5.  The C.F.R. has codified the 2016 version of the ER.  We will use the parties' lengthier citations and not try to figure out the why of their use.

No. 21-20174

This language does not impose a mandatory duty on the Corps. Certainly, the term "shall" is suggestive of an obligation. Even so, the word "shall" here is modified by the phrase "as necessary," which is then followed by several circumstances that may prompt revising a WCM. Since the regulation does not specify when such conditions require the Corps to update a WCM, the Corps must exercise discretion in deciding when updating a WCM is necessary. Such discretion is antithetical to a mandatory duty. We conclude there is no discrete, mandatory duty to revise.

### ii.   *Failure to acquire additional land*

The County Parties also argue the Corps was legally required to acquire additional lands at the time the Corps adopted the WCM. The duty is said to arise under the following Engineer Regulations, namely, ER 1110-2-240 § 3-2(c), ER 405-1-12 § 2-12, ER 405-2-150, and guidance documents such as Engineer Technical Letter ("ETL") 110-2-22. To the extent possible, we analyze each.

First, the County Parties rely upon ER 1110-2-240, § 3-2(c). That section provides that "water control plan[s], including any allocation of storage it describes, shall be designed to achieve all authorized purposes of the particular project . . . in light of applicable law and existing conditions." *Id.* § 3-2(c). That language is aspirational, not mandatory.

Second, the County Parties rely upon ER 405-1-12 § 2-12. That regulation is neither available to the public nor in this record. It is entitled "Real Estate Handbook" and was apparently issued by the Corps. It allegedly states that "the Corps will take an adequate interest in lands . . . to accomplish all the authorized purposes of the project." § 2-12. The County Parties argue the term "will" mandates the Corps to acquire land for the authorized purpose of the project. The County Parties also quote language from Section 2-12(a)(2) of that ER which requires the Corps to purchase in

.

No. 21-20174

fee "lands below a guide contour line . . . established with a reasonable freeboard allowance above the top pool elevation for storing water for flood control." The Corps responds that the language does not specify how the Corps determines what is "adequate" or provide a deadline for when action should be taken, and that the Corps must exercise its discretion to decide what is "reasonable." The County Parties reply that the plain meaning of "adequate" is "legally sufficient" and that we should apply the plain meaning to this regulation. *See Adequate*, BLACK'S LAW DICTIONARY (11th ed. 2019).

We conclude the County Parties have created a sufficient issue, based on what we have available now, to make a plausible argument that the Corps had a mandatory duty to acquire additional lands under ER 405-1-12. Because the regulation is not a public document and is not part of the record, we are unable to review the language of the regulation. *See* Department of Defense Department of the Army Real Estate Handbook, 84 Fed. Reg. 35,034 (July 22, 2019) (to be codified at 32 C.F.R. pt. 644) ("current internal policy and procedures are maintained in Army Corps of Engineers Regulation ER 405-1-12, which is not available to the public"). We remand so the Corps can produce the ER under whatever protections are justified by the reasons for its non-public status, and the district court can determine whether the actual language creates a duty.

Third, the County Parties rely on a combination of Corps guidance documents. The complaint alleges, "Corps regulations and hydrologic criteria for acquisition of reservoir lands, including for example ETL 110-2-22 and the guidance set forth in ER 405-2-150[,] required the Corps to acquire upstream real estate up to the limits of the MDP." The complaint also contends, "[i]nternal Corps documents dating back to 1980 acknowledge '[i]n order for Addicks and Barker to be in strict compliance with ETL-110-2-22' . . . it would be necessary to acquire real estate interests

in the area.'" The referenced document is described in a motion as containing "the hydrologic criteria for acquisition of reservoir lands." Yet again, the County Parties are relying on a non-public document not in the record.

Another missing document is ER 405-2-150, which was superseded in 1979. The County Parties assert ER 405-2-150's relevance is "to confirm the Corps' longstanding regulatory obligation to take adequate property interest in lands to accomplish the authorized purposes of the project. The Corps' past interpretation and application of ER 405-2-150 is relevant to the binding effect of current regulations updating but not materially altering the former regulation." In light of the fact this Engineer Regulation was "superseded" in 1979, and the litigation here concerns failures to respond to events in 2016 and 2017, we do not consider any effect it might once have had.

As to ETL 110-2-22, an initial question is whether Corps guidance documents can create binding duties on the Corps. In *SUWA*, the Court considered whether the Bureau of Land Management ("BLM") could be compelled to comply with certain provisions of its land-use plans. *SUWA*, 542 U.S. at 67. The plaintiffs there argued one land-use plan "obligated BLM to conduct an intensive [off-road vehicle] monitoring program" due to damage to the "Factory Butte area" caused by such vehicles. *Id.* at 68. The plaintiffs argued such a monitoring program was required because the plan stated the area "will be monitored and closed if warranted." *Id.* The Court rejected this claim because the plan did not provide a "clear indication of binding commitment" on the BLM. *Id.* at 69. The Court held that, absent "language in the plan itself creat[ing] a commitment binding on the agency," the plan was not enforceable under Section 706(1). *See id.* at 71.

Under *SUWA*, then, we need to know whether ETL 110-2-22, by its own terms, binds the agency to a legal position or "produce[s] legal

consequences or determine[s] rights and obligations." *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). We applied that standard when deciding whether the EEOC was bound by a guidance document it prepared on how Title VII affected employers' refusals to hire due to applicants' criminal records. *Id.* at 437. We considered whether the document "appears on its face to be binding[ ] or is applied by the agency in a way that indicates it is binding." *Id.* at 441 (quoting *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547, 548 (2016)) (alterations in original). "In some cases, the mandatory language of a document alone can be sufficient to render it binding." *Id.* at 441–42 (quotation marks and citations omitted). We concluded the guidance did bind the agency. *Id.* at 442. Indeed, the EEOC conceded it was bound to apply its own guidance. *Id.* at 444.

The County Parties argue ETL 110-2-22 similarly provides a legally binding commitment on the Corps. The County Parties rely on an opinion from another circuit holding that the Missouri River Main Stem Reservoir System Reservoir Regulation Manual ("Master Manual"), produced by the Corps under the Flood Control Act, was legally binding. *See South Dakota v. Ubbelohde*, 330 F.3d 1014, 1029 (8th Cir. 2003). There, the Eighth Circuit reviewed whether three district courts erred by issuing a preliminary injunction barring the Corps from releasing reservoir water during a severe and lengthy drought. *Id.* at 1019. The case arose out of a disagreement among states with the Corps' management of reservoir water during prolonged drought conditions on the Missouri River. *Id.* at 1019–20. Due to the water shortage, "the Corps decided to release water from Lake Oahe in South Dakota to maintain downstream navigation on the Missouri River," while holding water constant at other reservoirs. *Id.* at 1021. South Dakota filed suit under the APA, arguing the Corps had acted arbitrarily and capriciously

by releasing water from a reservoir and sought to enjoin the Corps from releasing reservoir water for a limited time. *Id.*

The court considered whether there was "'law to apply.'" *Id.* at 1027 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). The court held there was law to apply because the Corps' actions were "constrained both by the Flood Control Act and by the Master Manual." *Id.* The court stated, "[w]here a policy statement purports to create substantive requirements, it can be a legislative rule regardless of the agency's characterization." *Id.* The court held the Master Manual was binding "because it set[ ] out substantive requirements, and its language and context indicate that it was intended to bind the Corps'[ ] discretion." *Id.* at 1028.

ETL 110-2-22 is neither public nor in the record, so we cannot examine its language. Thus, we look at whether the complaint plausibly pleads that it binds. *See Iqbal*, 556 U.S. at 678. The complaint alleges each reservoir was designed to have an MDP for detaining floodwater that exceeds the boundaries of GOL. The complaint alleges internal Corps documents dating back to 1980 stated it was "*necessary* to acquire real estate interests in the area" up to the maximum storage capacity to be in "strict compliance with ETL-110-2-22." The Corps obtained an estimate for the acquisition of an additional 4,840 acres behind the Addicks Dam and 3,860 behind the Barker Dam, which would ostensibly have been all the land up to the MDP. The Corps failed, though, to request authorization from Congress to acquire the additional land.

Further, the Corps' Chief Engineering and Construction Division and Dam Safety Officer, Rob Thomas, testified concerning the mandatory requirements set out in ETL 110-2-22 and other Corps documents during the Upstream Takings Litigation, a case brought in the Court of Federal Claims.

*In re Upstream*, 146 Fed. Cl. 219 (2019). These "internal Corps documents dating back to 1980" are not in the record nor are they named; rather, the transcript of Thomas's trial testimony indicates he quoted and interpreted the documents introduced during that proceeding. Thomas testified about ETL 110-2-22, stating it is a 1970 document entitled "Hydraulic Criteria For Acquisition of Reservoir Lands." He confirmed the purpose of the document is to "provide[] guidance to district engineers who are applying hydraulic engineering principles to establish guidelines on which to base the upper limits of land acquisitions in reservoir areas of dam and reservoir service projects," such as the Addicks and Barker dams and reservoirs.

Additionally, Thomas testified that a 1979-1980 document with the subject "Buffalo Bayou and Tributaries, Spillways for Addicks and Barker Dams," directed to the Corps Southwestern Division Engineer and sent from a Corps District Engineer, states, "[a]cquisition of upstream real estate to the standard project flood pool elevation plus freeboard is necessary to comply with ETL-110-2-22." Thomas testified that another 1980 document with the subject "Buffalo Bayou and Tributaries, Spillways for Addicks and Barker Dams," from the Corps Chief Real Estate Division, states: "In order for Addicks and Barker Reservoirs to be in strict compliance with ETL-110-2-22, we determined that it would be necessary to acquire real estate interests" up to the MDP.

Taking these allegations as true, and construing them in favor of the County Parties, we conclude they have adequately pled ETL 110-2-22 was binding and imposed a mandatory duty on the Corps. The language from the internal Corps documents quoted in the complaint and the testimony from a Corps representative support the inference that ETL 110-2-22 was binding; they demonstrate ETL 110-2-22 set out substantive requirements to acquire additional land and that its language, context, and treatment indicate it was intended to bind the Corps' discretion. *See Ubbelohde*, 330 F.3d at 1028.

No. 21-20174

We remand so ETL 110-2-22 may be produced and for further factual development on whether it is binding. Then, the district court may be consider whether ETL 110-2-22 imposed a mandatory duty on the Corps to acquire additional lands. *Cf. SUWA*, 542 U.S. at 72.

### iii.   Other authorities

The County Parties argue various other regulations and guidance documents impose discrete, mandatory duties on the Corps. The County Parties have not, however, attempted to explain how the Corps failed to follow these regulations and guidance documents, nor have they related them to any of the agency actions challenged in their complaint. We conclude the County Parties have forfeited any claims arising under those regulations and guidance documents by failing to brief them adequately on appeal. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

### III.   Reassignment on remand

An appellate court may order the reassignment of a case to another judge on remand. *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997). This power, however, is "extraordinary" and "rarely invoked." *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892 (5th Cir. 2021) (quotation marks and citation omitted). In considering whether to reassign a case, we apply a "lenient" and a "stringent" test. *Id.* The County Parties assert reassignment is necessary under both tests.

The stringent test considers three factors: (1) whether the original judge would reasonably be expected to have difficulty putting aside previous views determined on appeal to be erroneous, "(2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 892–93 (quotation marks and citation omitted). The lenient test asks whether an objective observer would

reasonably question the judge's partiality. *Id.* at 893. The stringent test's second "factor aligns with the question posed by the [lenient] test." *United States v. Khan*, 997 F.3d 242, 249 (5th Cir. 2021).

We identify the actions the County Parties insist support reassigning the case. First, they argue the district judge denied the County Parties' request for limited discovery to obtain the administrative record and lacked any competent basis for facts he included in the dismissal order. Second, the district judge ordered the Corps to "furnish a one-page statement that describes — in clear, practical terms — what it did, why it did it, and the consequences of alternative responses" without requesting a response from the plaintiffs. Third, they contend he adopted the Corps' "self-serving" narrative of the facts and "embellished" the narrative with facts not provided by either party.[11]

We do not find the district judge's conduct or views expressed in the order to reveal an inability to be impartial. Just taking the demand for a one-page summary, we remark it is not clear to us whether the actions that led to the WCM were designed to produce a record and, if so, what the record would contain. The Supreme Court once authorized ordering an agency to supplement the record of informal rulemaking by providing a summary of its decision-making. *Overton Park*, 401 U.S. at 420. The district court's actions here were not that different. Yet, here, the predicate for such a summary, namely, the absence of an actual record, has not (yet) been shown. We explain.

---

[11] The district court wrote that, had the Corps not detained the floodwater, the reservoirs would have failed, thereby releasing "three trillion gallons of water . . . down the bayou" and "causing catastrophic damage and loss of life all the way to Galveston Bay." The County Parties seem to be correct that there is at least no direct support for this statement in the record.

In its motion for limited discovery at the district court, the County Parties alleged a record would contain "internal Corps documents interpreting (1) Corps regulations setting requirements for acquisition of land in the Reservoirs, (2) requirements for the [WCM], and (3) regulations concerning amendments to the WCM." The County Parties allege they know those documents exist and are readily available to the Corps because they were previously produced by the Corps and introduced in evidence in open court during the Upstream Takings Litigation. The Corps can respond on remand as to what record exists.

Though some of the district judge's rulings were unconventional, we do not believe his actions would "reasonably cause an objective observer to question [the judge's] impartiality." *Miller*, 986 F.3d at 893 (quotation marks and citation omitted) (alterations in original). Conversely, reassigning the case to another judge would likely entail waste and duplication out of proportion to any gain in the appearance of fairness. Although the original complaint was filed in March of 2018, the record is short and there has yet to be any discovery. The County Parties have not shown reassignment is merited.

We REVERSE and REMAND for further proceedings consistent with this opinion.